SCOTT CHILES, APPELLANT, V. CUDAHY PACKING COMPANY, A CORPORATION, APPELLEE.

64 N. W. 2d 459

Filed May 21, 1954. No. 33558.

*Paul I. Manhart,* for appellant.

*Kennedy, Holland, DeLacy & Svoboda* and *Edwin Cassem,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE,. YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff Scott Chiles filed his petition in the Nebraska Workmen's Compensation Court on April 13, 1950, seeking compensation for injuries and disability allegedly caused by an accident arising out of and in the course of his employment by defendant Cudahy Packing Company on March 23, 1950. Defendant for answer thereto denied generally and prayed for dismissal of plaintiff's petition with prejudice. On June 23, 1950, after hearing before one judge of the compensation court, plaintiff's petition was dismissed upon the ground that his alleged disability was not caused by an accident arising out of and in the course of his employment by defendant but was due to natural causes, thus not compensable. On July 6, 1950, plaintiff waived rehearing and appealed directly to the district court for Douglas, County. His petition on appeal was filed July 6, 1950. On July 10, 1950, defendant filed its answer, admitting that on and prior to March 23, 1950, plaintiff was in

the employ of defendant but denying generally and specifically denying that plaintiff sustained any accident arising out of and in the course of his employment. It alleged that he had been ill and off work immediately prior to March 23, 1950, when he returned to work still suffering from such illness, and subsequently fainted on the job. It was alleged that the order of dismissal by the compensation court was correct, therefore it should be affirmed. The prayer was for dismissal with prejudice. Plaintiff's reply was a general denial.

On June 8, 1951, there was a trial de novo on the issues thus presented, whereat evidence was adduced, at conclusion of which the parties were each allowed time for filing briefs. Subsequently, on September 10, 1951, the trial court rendered judgment, finding generally in favor of defendant and against plaintiff on the ground that plaintiff had failed to carry the burden and prove by a preponderance of evidence that his alleged disabilities were caused by any accident arising out of and in the course of his employment by defendant. Therefore it was adjudged that plaintiff's action should be and was forever dismissed at plaintiff's costs.

On September 11, 1951, plaintiff filed a motion for new trial which was not argued and submitted by him until December 4, 1953. Thereafter on January 15, 1954, plaintiff's motion for new trial was overruled and he appealed to this court, assigning that the trial court erred in making its findings aforesaid and dismissing plaintiff's action. We conclude that the assignment should not be sustained.

Section 48-151, R. R. S. 1943, provides, insofar as important here: "(2) The word 'accident' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury."

As recently as Dietz v. State, 157 Neb. 324, 59 N. W.

2d 587, this court held: "On any appeal to this court in a workmen's compensation case, the cause will be here considered de novo upon the record, bearing in mind that where the evidence is conflicting and cannot be reconciled, this court will consider the fact that the district court that tried the cause de novo and observed the demeanor of witnesses, gave credence to the testimony of some rather than to the contradictory testimony of others.

"The burden of proof is upon the claimant in a compensation case to establish by a preponderance of the evidence that personal injury was sustained by the employee by an accident arising out of and in the course of his employment.

"The rule of liberal construction of the Workmen's Compensation Act applies to the law, not to the evidence offered to support a claim by virtue of the law. The rule does not dispense with the necessity that claimant prove his right to compensation within the rules above set out, nor does it permit a court to award compensation where the requisite proof is lacking."

See, also, Rahfeldt v. Swanson, 155 Neb. 482, 52 N. W. 2d 261, wherein we reaffirmed also that: "An award of compensation under the Nebraska Workmen's Compensation Act may not be based on possibilities, probabilities, or conjectural or speculative evidence.

"A court is not required to permit a litigant to trifle with the processes of the court by asserting therein under oath at different times the truth of each of two or more contradictory versions of an event or events in controversy according to the necessities of the particular occasion presenting itself."

In the light of such rules we have examined the evidence and summarize the pertinent parts thereof. In doing so, we bear in mind not only that the evidence is directly conflicting and irreconcilable in most material respects but also that the trial court saw plaintiff and his witnesses, heard them testify, and saw and

heard plaintiff impeached upon material matters about which he previously testified contrarily in the compensation court.

The record fairly discloses that: Plaintiff worked for defendant about 1½ years. Just previous to March 23, 1950, he had been off duty 3 days. The first day was his off-duty day, but the next two he had not reported for work. He testified it was because he had a cold for which he had taken cold tablets and cough syrup purchased by him at a drug store. There is competent evidence, however, including admissions by plaintiff, that he had intestinal flu for which he had taken some pills and was treated by a physician. He brought some medical tablets with him to the job that night. On March 23, 1950, when he reported for work prior to the 11:30 p. m. shift in the fertilizer tank department, plaintiff told the night foreman who inquired about his previous absences: " 'I almost died.' " He then said: " 'I am sick, but I am going to try and make it tonight, but I don't know whether I can or not.' * * * 'Yes, I told him I had a cold and was not feeling good.' * * * 'I told him I had not been feeling well for two days, and he said if I had not been feeling good, I could not come to work.' "

Nevertheless, plaintiff, claiming that he felt all right, reported for work making block feed. About 11:45 p. m., just as he went to pick up a loaded two-wheel truck by the handles upon it, he felt an awful pain in his back, was not feeling good, and thereafter as he went to pull it up a little slant his foot slipped. Thereupon he dropped the truck, fell forward to the concrete floor flat on his face or on his right shoulder, and then went over, spread out flat on his face, and was unable to get up. Two fellow employees picked him up and laid him out straight on some sacks. Plaintiff did not remember what took place or hear anything that was said while they were picking him up. Concededly he had the pain before he claims to have slipped, and there was nothing on the floor which caused him to slip. One of such

employees reported to the foreman that plaintiff "had passed out." Both fellow employees were witnesses for plaintiff. One of them testified: "Well, I saw him there lifting the truck up, and he fell, and that is all. * * * Well, he was pulling this load of bone meal on the truck, and he slipped and went down. * * * Straight down, with his face down." He was conscious, but kept right on lying on his face and said "he wanted to call for his wife, and he wanted to go to the hospital." The other fellow employee testified: "I was standing looking at him when he picked up the truck, he started over to that about five or six steps, and then he pitched over." When asked if he saw any slipping or anything like that, the witness replied: "No, I did not know. I don't think there was no slipping or nothing."

The foreman first called the guards, telling them to bring a stretcher down to pick plaintiff up and take him to the plant physician's office, and then went down where plaintiff was lying on some sacks moving his head backwards and forward, saying: " 'I want to go home, or take me to the hospital.' " Plaintiff was removed to the examining room on a stretcher, but said nothing during that period about an accident. The plant physician was called. When he arrived plaintiff was conscious and said that "he had fainted as he stooped over to wheel a truck * * * he was leaning over to pick up the truck and he fainted and fell forward." He complained of "abdominal pain." He also gave a past history of "being sick for the previous three or four days" for which he had been "treated professionally by a doctor at Peoples Hospital" who "had given him some pills."

The plant physician then examined plaintiff, who had a low-grade temperature, dehydration, dry mucous membranes, rapid pulse, hyperactive abdominal bowel sounds, and general diffuse abdominal tenderness on palpation, all typical only of intestinal flu. Plaintiff neither then nor previously made any complaint of pain in his back

or that he had any accident or slipped and hurt his back. The plant physician then gave plaintiff a capsule containing an intestinal antispasmodic, which made him feel better. Plaintiff seemed nervous and excited as people often are after fainting, and requested confinement in a hospital. However, the physician told him that he did not need it, so plaintiff got up and walked around a little while, after which the physician, using his own car, took plaintiff home. On the way there plaintiff told the physician that he had a rupture. Upon arrival at his home plaintiff got out of the car and walked into the house without assistance. About a week previously, while plaintiff was having something removed from one of his eyes, he told the plant physician he "had some back trouble." In that connection, also, on March 28, 1950, after the accident, plaintiff gave a history to a physician at People's Hospital in which he recited: "was hurt in back 1949 April. Was hit tub—Cudahy Pk. Co. 1 mo later was back at work." Also, subsequently, on March 26, 1951, plaintiff told an orthopedic surgeon who examined him that about 1 year before March 23, 1950, he was struck by a tub on the lower part of his back while working for defendant. X-rays were taken at hospital, he was treated by a physician, and was off work about 2 months at that time.

On March 24, 1950, plaintiff's wife called the plant physician at his office several times, wanting him to come over to plaintiff's home, but he suggested that they come to his office, claiming that from his examination plaintiff was not injured, and his disability was not compensable.

At about 1 o'clock the next morning, March 25, 1950, the plant physician was called by County Hospital where plaintiff had been taken in a taxi by his wife. Plaintiff stayed in the County Hospital until the afternoon of March 27, 1950, where he claimed a back injury and pain from "loading 100# sacks and experienced

sudden severe pain in upper lumbar area not referred to legs." X-ray examination there disclosed: "lumbar spine is negative." Neurological examination was negative. "Compression fracture unlikely." Plaintiff then had a temperature of 99 degrees and physical examination was made questioning whether or not he had a "retro peritoneal hemmorrhage, or retro cecal appendix—acute appendicitis." However, after examination, it was tentatively decided that plaintiff possibly had either a "lumbo sacral strain" or "neuralgia" or "psychoneurosis." He was given sedatives mostly and when he was "fairly well up and about" he was "dismissed walking" and told that he "should report to the University Clinic." In the afternoon of March 27, 1950, plaintiff's wife took him home in a taxi and that night she called his own physician who operated People's Hospital. He gave plaintiff some pills and in 2 or 3 days plaintiff went over to that hospital where he stayed 12 or 14 days. The fragmentary hospital record kept by that institution is of little help. On April 25, 1950, and again on June 5, 1950, his physician reported in writing to plaintiff's attorney: "From the history of the case, my diagnosis is a displaced intervertebral disc. His condition is considerably improved and the symptoms have lessened markingly." Plaintiff gave his physician a history "that he had fallen, he lifted a truck with some sacks * * * and that he had excruciating pain at the time and this apparently knocked him out." His physician's tentative diagnosis was "trouble with intervertebral disc." The physician testified that he was not a spine specialist and that plaintiff's "case was rather obscure in some respects, and I was not too sure that the difficulty was in the intervertebral disc," so he called in another physician who was also "in doubt because it was not a typical case." However, after continued observation plaintiff's physician concluded that since plaintiff had general pains and a tender spot be-

tween the fourth and fifth lumbar vertebrae, it was a herniated intervertebral disc.

Another physician who was called by plaintiff's attorney testified for plaintiff. He saw plaintiff first about May 31, 1950. The history given him by plaintiff was that he "was pulling some such truck loaded with meal sacks that weighed approximately one thousand pounds. He felt a pain in his back along the left and in the middle of his hips. He pulled the truck about ten or fifteen feet, and he pulled it to where there was a drop-off, and said truck required extra effort to pull. He fell down and was unable to raise up under his own power." His examination disclosed certain pains and clinical signs present in the immediate area of the fourth and fifth lumbar vertebrae in plaintiff's back, with apparent loss of sensation on the right side extending down to his toes. Plaintiff said he had never previously had such complaints in that region, and, as stated by the physician, "there was some trouble there but just what difficulty it was we could not give it a name," so he sent plaintiff to an orthopedic surgeon. The physician testified that it was fair to assume that "this lifting and pulling" had to be considered as a "possible entity" in causing plaintiff's disability. He saw plaintiff upon several occasions and discovered that plaintiff got alternately better and then worse again, but that he would eventually approach normal and at time of trial was disabled only about 15 percent.

In August 1950 plaintiff was examined by the orthopedic surgeon aforesaid. He testified in plaintiff's behalf. The history given him by plaintiff was of "having sustained a fall while at work, he was pulling a cart and he slipped and fell, and following that he had severe pain in his low back which radiated down to his right leg and down to the foot. He complained of being without the use of the leg for a while, he said his leg was paralyzed and he had trouble with the leg going to sleep, and it slipped on him." Spinograms taken were nega-

tive, but such fact does not in all cases absolutely rule out a diagnosis of disc syndrome. Upon finding that plaintiff's dermatone picture was "not the normal thing we usually see," but was a "little bit bizarre * * * wider than the nerve irritation that we usually see in a disc syndrome" the orthopedist, being in doubt whether plaintiff had a herniated disc or arthritis, did not recommend surgery but put a brace on plaintiff's back and he began to improve. The orthopedist admitted that there were many causes for back pains including abdominal spasms, but here there "would be a strong indication it was a result of the accident." At the time of trial he estimated that plaintiff had a disability of only about 10 percent.

Another orthopedic surgeon who examined plaintiff on March 26 and 27, 1951, at request of defendant, made a written report received in evidence by stipulation. The pertinent history given him by plaintiff was that "he was pulling a heavily loaded truck up a slight incline when he slipped and fell forward." X-rays taken disclosed "no evidence of bone injury, either fracture or displacement, involving any part. * * * Spinograms made after injection of pantopaque do not reveal any definite disc pathology or alteration in the outline of the pantopaque column. * * * The fact that the patient's reactions to examination were so much more pronounced the first day I saw him than at the time of the second examination on the following day leaves no doubt in my mind that the patient very grossly exaggerates." In the light thereof, and physical examination, such surgeon said: "I find no convincing, positive, physical objective signs of injury or disability in this patient. * * * The patient has not sustained any permanent bodily damage." In that connection, on May 7, 1951, plaintiff went to work for an electric company digging ditches and putting down tile. Thereafter he became a carpenter's helper and was so employed at the time of trial in district court. He testified that he has some pain difficulty

at the beginning and end of the day, but during the day he works very well and sleeps fine after he takes a hot bath.

In the light of such evidence we conclude, as the trial court did, that plaintiff failed entirely to prove by a preponderance of the evidence that he had an accident arising out of and in the course of his employment which caused any disability of which he complained. To conclude otherwise would be purely possibility, speculation, and conjecture. Therefore, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.